the last case on our calendar, which is 18-1440-AG, William Castillo Guardado. Yeah, good afternoon, your honors. May it please the court. My name is William Castillo Guardado. I am a nonprofit attorney at Catholic Charities of the Archdiocese of New York. I represent Armando Tanusantoso and Guadalupe Dayati, a faithful Catholic family fleeing persecution in their native Indonesia. The Board of Immigration Appeals abused its discretion in two instances when it denied Mr. Tanusantoso's motion to reopen in a brief one and a half page decision. First, the agency found no change in country conditions between 2003 and 2017, in spite of undisputed evidence of a material worsening of conditions during that time for Christians and ethnic Chinese Indonesians like Mr. Tanusantoso, and which has been recognized by three sister circuits and the District Court of Massachusetts. Second, the agency required Mr. Tanusantoso to submit a new asylum application with his motion to reopen, contrary to clear and unambiguous regulatory language that does not require such an application in this case. But even if the regulation was interpreted correctly, failure to include an application isn't fatal to the motion as the BIA has recognized in its own interpretation of the regulation in matter of your one with it. This court should not allow Mr. Tanusantoso to return to danger because of a technical footfall that the agency never previously insisted on. With regards to the first point, there has to be a point in country conditions in which reopening is warranted. And in the brief, I discussed that as a red line, but it could also be considered a tipping point. For example, from 2004, there was increased enforcement of black people. Before 2004, there were only 60 convictions in the span of a 40-year period. But from 2004 until 2014, there were over a hundred blasphemy convictions. And the most serious of those convictions was for the governor of Jakarta, a powerful figure who is Christian and ethnic Chinese, and he was not safe. He was convicted of blasphemy in 2017 because he- Excuse me. This is Judge Cabrera. I just wanted to interject for a moment. Sure. Let's assume that everything you say is entirely right about conditions in Indonesia. It is a fact, is it not, that Indonesia is an archipelago of over 6,000 islands, right? Yes, Your Honor. And there isn't any doubt, is there, that some of those islands are in fact predominantly Christian. Isn't that right? I'm not sure as to the specifics. Christians comprise about 10% of the population out of a population of 250 million. Of the whole of Indonesia, but there are some islands among those 6,000 which are predominantly Christian. That's probably a matter, I think, a matter of public record of which you could take, we can take judicial notice, but in any event, trust me when I tell you that that's the case. So if that's the case, or assume for the argument that that's the case, does that have any bearing on the situation? That there are specific pockets where Christians live? I know, I know, Your Honor. No, not pockets, whole islands, whole islands. Well, what is significant here is that this conviction was preceded by mass protest in one of the main islands, which is the island of Java. Sorry, I'm not making myself clear, Mr. Casillo. My point is, if the concern is that your client would face difficult, unbearable circumstances in Indonesia, which I have no doubt that that is true about many parts of Indonesia. And I'm willing to accept that for the argument, for the sake of argument. We do not agree that if you accept, if you accept my proposition for the sake of argument, that there are islands which are predominantly or overwhelmingly Catholic, doesn't that make a difference? That is, were he repatriated to Indonesia, presumably he would wish to go to one of those islands rather than the islands where he might face hostility. Well, Your Honor, I don't think it would make a difference simply because the blasphemy law, for example, is something that is done by the government. So it doesn't matter where he lives, frankly, because if he is accused of blasphemy for any minor statement, he risks conviction, in addition to just fearing violence from mobs or people that wish to attack Christians. And that's an important point here. We're looking at the record evidence that indicates that there was a rise and increase in intensity of those conditions. What island is he from to begin with? He's from the island of Java. From Java, yes. Yes, Your Honor. And I see that my time is up and I'll reserve the rest if you have any questions. You've reserved a couple of minutes, so we appreciate your argument very much and we'll hear from Mr. Tennyson. Good afternoon. May it please the court, Robert Tennyson for the government. What I wanna do is really quickly respond to the petitioner's two arguments and then if this court has any questions for me, I'll respond to those. Very quickly, with regard to petitioner's argument that he was not required to file a fresh application for asylum with his motion to reopen. And the reason he gets for it is that you can somehow file a motion to reopen that goes back to the original asylum application. And that counts, that's good enough and that's a basis for reopening. The statute and the regulations, it doesn't work that way. Under 8 U.S.C. 1229 A.C. 7 C.2, an individual who seeks to avoid the time limitations on the basis of changed country conditions is doing so. And the statute specifically says that there is no time limit for filing a motion to reopen if the basis of the motion is to apply for relief in the form of asylum or withholding. And the same thing is true within the regulations which also state that the time limitations don't apply when someone is seeking to file a motion to reopen to apply or reapply. The determination is if an individual is seeking changed country conditions, is arguing changed country conditions, they are filing a forward-looking application or a forward-looking reapplication for asylum or withholding relief. As a result, yes. Why are they doing that? Why are they doing that? They've already filed an application for asylum and all they're doing is now coming in with one aspect of that application to say that one of the bases for denying my application before has changed. Right. Why does that require completely new applications? The, a couple of things. Right, it's not the same old, it's not the same application. The previous application may very well have been, and this would often be the case, may have been for some different set of circumstances, some different identification. Remember the petitioner here originally filed an asylum application that was untimely. And in, before the immigration judge, the first time around attempted to argue that that asylum application should be permitted to go forward because of changed country conditions then. And as a result, you know, that asylum application would go forward. The petitioner could now with a new application be arguing different conditions and will be arguing it on the basis of a new set of facts. It's a forward-looking application. Again, it does, it's not an application to return an individual back to say their asylum claim back in 1999 or March of 2001, as the petitioner's case may be. In addition, there's another reason why you would want to do that. And that is you don't wanna have individuals who file asylum applications to file, to seek reopening. And then once they have reopening, go and rely on some other form of relief or seek some other, you know, procedure. You want to have them pin down on the specific application in which they filed. And as a result, you have a regulation that specifically requires them to file the application. Now, it's not entirely mandatory, right? As Juwan Dosen held, that if the government joins in the application and the board in that case was very narrow and said that it was acting in a very, very narrow fashion, that in that circumstance, the application may be foregone. And you can understand, you can consider other circumstances in which the time and number of limitations can be avoided as well. Say, for example, you have the individual file the, you know, claim that they are entitled to equitable tolling on their original application because their attorney provided an effective assistance of counsel. In that case, they are going back to the original application. And they're saying that it was wrongly handled in the first instance. But when it comes to the new application, when you are seeking changed country conditions and you're attempting to avoid the time bar, what you are doing is you're filing a forward-looking application. And in that circumstance, you need to apply, you need to provide the application to the agency. Petitioner didn't. And as a result, you know, that was sufficient grounds for the board to deny the application. Okay, what about the other grounds? The other grounds, right, the changed country. Yeah, go ahead. Right, that wasn't an abuse of discretion. I mean, if you look at the record, at the time he sought to file his original asylum application, and he tried, and he attempted to argue changed circumstances. You're, at that point in time, in Sulawesi, in what, the eastern, I believe it's Moluccas Islands. I guess it's Moluccan Islands. You had vast intersectarian violence, right? You had thousands of people die. You had over 5,000 individuals forcibly converted from Christianity to, you know, to Islam. And you had widespread church bombings, including one in Jakarta, that injured over 70, you know, over 70 individuals. I understand all that. Right. And I understand those arguments. But here's my concern. My concern is that in a case that one of my colleagues here on the bench authored a number of years ago, Zhang against Gonzalez. Right. We held that the BIA abuses its discretion when its findings are devoid of any reasoning or contain only summary or conclusory statements. And if you look at the BIA's second to last paragraph, we see precisely that. So there's no indication what the BIA has really considered in terms of these changes and how many, what they make of the arguments that the petitioner is advancing now about the use of the blasphemy law, the application of Sharia law to Christians, things of the intensity of the fundamentalist changes that have occurred in the Muslim religion on the island and how it's impacting the Christians, all of which may be easily explained as not a change in country conditions, but they aren't explained by this opinion as a change of country conditions. They're not addressed at all. And this is not a problem. So the board could have written more, definitely. Sadly, it often can't, but I believe here it wrote enough. Remember the board- We have one more minute. Oh, thank you. They gave us three sentences, none of which specified any particular arguments that were being made by the petitioner as the particular incident. Right, if you look at the paragraph above, there is a discussion of the current evidence, right? And there the board says the current evidence indicates that the Indonesian government continues to promote religious freedom. And it also discusses the case, which is highlighted both in the petitioner's motion to reopen and put front and center in the petitioner's motion to reopen and in the brief about the governor of Jakarta and the blasphemy conviction. So the board is attending to these particular facts. It just doesn't find them to be sufficiently compelling and sufficiently, I guess what, to reveal such a sufficient material change in country conditions that it would reopen the case. And the board is given a great deal of discretion to make that determination. I believe that there's enough here from what the board said that this court can look at it and see that they did consider this. And the board isn't required to expressly parse or refute each and every specific aspect of the petitioner's evidence, which wasn't a very significant evidentiary packet to begin with. In substance, it's two news articles, the State Department's International Freedom Report and the United States Commission on International Religious Freedom Report. And all of those are very brief. There wasn't much for the board to dig into here. And as a result, their discussion in this case is more than adequate to meet the standard of the abuse of discretion standard. This court doesn't have any other questions or I'm open to any other questions. If the court has- Thank you very much, Mr. Tennyson. Mr. Castillo, you've reserved two minutes. Yes, Your Honor. I want to go to the application piece. Excuse me. The government argues that this is not a case where we're going back to the original application, but I disagree. We are going back to that application and merely showing a change in country conditions, the legal basis for the case has not changed. He's still arguing persecution based on his Christianity and Chinese ethnicity. And we have to follow the rule against surplusage and give each word in the statute effect. The government in its brief argues that all applications, all motions to reopen must contain an application for relief and that's not true. But even if we are required to submit an application for relief, this is a case where Mr. Tennyson told, where the agency never insisted on including an application in previous motions to reopen filed in 2004 and 2008. It would be- You have one more minute. Thank you. And with regard to the argument about changed country conditions, the point here is that the agency has to address agents, excuse me, evidence that is favorable to the petitioners as indicated in Yang Chen in this court and also in Zhang versus Gonzalez. And they simply did not do that in the three short sentences that they wrote. They do discuss the conviction of the governor of Jakarta, but they did not discuss the skyrocketing rate of blasphemy convictions and they completely ignore the mention of Sharia law. And for those reasons, the agency abused its discretion in a decision that was concluding and contained only summary statement. If you have any other questions. Yes? Yes, I do. Was there an issue before the BIA or before the IJ along the lines of what Judge Cabranes mentioned earlier that the government, for instance, argued that if he's returned, he may not face any of these persecutions or problems because he can live elsewhere. He doesn't have to live in Java. Your Honor, that's not something that's currently on appeal. The board did not address Mr. Tim Sancilla's eligibility for relief. And in fact, the lower court, the immigration judge Sarah Burr in 2003 found Mr. Tim Sancilla credible and said that there is a likelihood of future persecution. And this is stated in the record on page 631. I understand, but did she specifically address the fact that there are enclaves of Catholicism in Indonesia where he'd be safe? Was that ever specifically part of the litigation? She did not, Your Honor. She did indicate that there was a likelihood of future persecution, but because of a one-year filing deadline issue, she did not grant. Maybe nobody had the astuteness to focus, as Judge Cabranes did, to focus on the differences that exist there, that may exist there. And that could have been something that in the record would make a big difference in the way this case could be viewed. Perhaps, Your Honor, it's something that we, the BIA did not address in its decision, so we do not know how they addressed the particular eligibility of Mr. Tim Sancilla. Okay. Okay, and if you have any further questions. Thank you very much. Thank you, Your Honor. Judge Sack, any questions? No, thank you. All right. This is excellent. We appreciate the arguments of both of you, which were excellent. We'll reserve decision, and we are adjourned. And I'll ask the-